## IN THE UNITED STATES DISTRIC COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| **CHANDA ADKINS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER:**  5:18-cv-01358 |
| | ) | |
| **WAL-MART STORES EAST, LP,** | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Brandon S. Steele, Esq. WV State Bar Number:  12423, The Law Offices of Brandon S. Steele,

3049 Robert C. Byrd Drive, Ste 100, Beckley, WV 25801, Telephone:  304-253-1230, Facsimile:

304-255-1520, Email:  bsteelelawoffice@gmail.com, and Anthony M. Salvatore, Esq., WV State

Bar Number:  7915, Hewitt & Salvatore, PLLC, 204 N. Court Street, Fayetteville, WV  25840,

Telephone:  304-574-0272, Facsimile: 304-574-0273, Email: asalvatore@hewittsalvatore.com

for plaintiff.

Plaintiff Chanda Adkins, by and through her undersigned attorney, as and for her complaint

herein against Defendant states as follows:

## INTRODUCTION

1.     This is an Action under the Americans with Disabilities Act of 1990, as amended, 42

U.S.C. §112101, et seq. ("ADA"), the West Virginia Human Rights Act §5-11-2, and the

Common Law of the State of West Virginia.

2.     Plaintiff Chanda Adkins ("Ms. Adkins" or "Plaintiff") was subjected by her supervisors,

managers, and other employees of defendant Wal-mart Stores East, LP (as described below,

collectively referred to herein as "Defendant"), over a lengthy period of time, to pervasive

discriminatory conduct relating to her disability, failure to reasonably accommodate her

disability, and ultimately retaliatory discharge.

3.      The Defendant subjected Ms. Adkins to discrimination, and to a hostile work environment because of her disability.

4.      As fully set forth below, the Defendant's discrimination against Ms. Adkins on the basis of disability included discrimination and harassment because she was diagnosed with Multiple Sclerosis.

5.      Ms. Adkins made numerous formal and informal requests to the Defendant (and filed two charges with the Equal Employment Opportunity Commission ["EEOC"]) regarding the disability based discrimination she suffered and retaliatory discharge.  The Defendant failed to address the Plaintiff's request for a reasonable accommodation, which was made in writing on two separate occasions, and ultimately discharged the Plaintiff in retaliation for filing an EEOC complaint.

6.      The Defendant retaliated against Ms. Adkins for making such complaints and requests, and filing such charges, including unjustly reprimanding her (treating her more harshly, in doing so, than her similarly situated co-workers who were not in her protected categories), by repeatedly ignoring her requests for scheduling that would have conformed to a reasonable accommodation to her condition of Multiple Sclerosis, and by executing a retaliatory discharge against Ms. Adkins for the false reason that she could not have worked the minimum number of hours required of an employee in her classification in a year when the fiscal year had only just begun.

7.      After hopelessly seeking a reasonable accommodation from her direct supervisor and the Corporate Office of the Defendant (two written requests to the Corporate Office for a Reasonable Accommodation on the Defendant's form) the Plaintiff filed an EEOC complaint against the Defendant on the basis of failure to make a reasonable accommodation.

8.   On or about March 20, 2017, approximately one month into the fiscal year, the Defendant, acting through Ms. Adkins' direct supervisor, who herself was one of the primary harassers of Ms. Adkins, illegally terminated Ms. Adkins in retaliation for her legally protected complaints, and/or because of her disability.

## PARTIES

9.   The Plaintiff was an employee of Walmart, Inc., in the Defendant's Store #1351 and other stores as directed in Southern, West Virginia from July 30, 2008 to March 20, 2017.  At all times pertinent to this action, plaintiff was an "employee" within the meaning of 42 U.S.C. §12111(4), and the common law of West Virginia.

10.   The Defendant, Wal-mart Stores East, LP, doing business as "Walmart," is a Limited Partnership headquartered in Bentonville, Arkansas.   Defendant has acknowledged in its response to the EEOC dated July 13, 2017 that Ms. Adkins was an employee of the Defendant, and has reported to the Internal Revenue Service as the plaintiff's employer for tax purposes.  At all times pertinent to this action the Defendant acted as the Plaintiff's "employer" within the meaning of 42 U.S.C. §12111(4), and the common law of West Virginia.

11.   The Defendant, Wal-mart Stores East, LP, doing business as "Walmart," is a Delaware Corporation, with a principal office address at 708 SW 8th St, Bentonville, AR, 72716.

12.   The Defendant has continuously been doing business in the state of West Virginia, and has continuously employed at least fifteen (15) employees, at all times relevant in this matter.

13.   The Defendant owns and operates Walmart stores in West Virginia, including the Walmart Store #1351 located at 1330 North Eisenhower Drive, Beckley, WV 25801 where the Plaintiff worked and where events relevant to this action took place, and other stores located in and around Southern West Virginia.

14.     At all times relevant in this action, the Defendant has continuously been an employer engaged in an industry affecting commerce.

15.     At all times relevant in this action, the Plaintiff was an employee of the Defendant's classified as a Pharmacist, engaged in work in the health services industry within the meaning of 42 U.S.C. §12101(3).

## PROCEDURAL HISTORY

16.     Ms. Adkins filed her first charge of discrimination with the EEOC alleging violations of the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.*, failure to provide a reasonable accommodation and harassment for the Plaintiff's disability of Multiple Sclerosis, on October 31, 2016.  Said charge was numbered 533-2017-00098 by the EEOC.

17.     Ms. Adkins filed her second charge of discrimination with the EEOC on April 28, 2017 alleging that she was unlawfully discharged due to the filing of the first EEOC complaint mentioned in paragraph 16 of this Complaint, in violation of 42 U.S.C. 12203(a).  Said charge was numbered 533-2017-00762 by the EEOC.

18.     Upon information and belief, the EEOC conducted an investigation into Ms. Adkins' charges of discrimination and retaliation against the Defendant.

19.     On July 20, 2018, the EEOC issued Notice of Right to Sue letters to Ms. Adkins in regard to the two aforementioned complaints of discrimination against the Defendant.

20.     Ms. Adkins took all necessary steps to exhaust her administrative remedies.

21.     Ms. Adkins took all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § because the action is based on the Americans with Disabilities Act, and pursuant to 28 U.S.C. §1337 because the action is based on a federal statute regulating commerce.

23.     This Court has subject matter jurisdiction over the state law claim pursuant to 28 U.S.C. §1367 because the state law claim forms part of the same case or controversy as the federal claims.

24.     Venue is proper in the United States District Court for the Southern District of West Virginia pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within the Southern District of West Virginia.

25.     Venue is proper pursuant to 42 U.S.C. §2000e-5(f)(3) because the unlawful employment practices are alleged to have been committed within the Southern District of West Virginia.

## FACTS
### Ms. Adkins Diagnosis and Disability

26.     Plaintiff Chanda Adkins is a female citizen of the United States that was diagnosed with Multiple Sclerosis in and around May of 2014 by Dr. Arun Venkatesun of the Johns Hopkins Hospital at 1800 Orleans St., Baltimore, MD 21287.

27.     Multiple Sclerosis is a chronic, typically progressive disease involving damage to the sheaths of nerve cells in the brain and spinal cord, whose symptoms may include numbness, impairment of speech and of muscular coordination, blurred vision, and severe fatigue.

28.     Upon information and belief, there is no known cure for Multiple Sclerosis, and victims of the disease endure the aforementioned symptoms on a daily basis for the rest of their lives. Multiple Sclerosis is not a transitory impairment with an expected duration of six (6) months or less, but is a condition that will affect the victim for the rest of their lives.

29.    The treatment for Multiple Sclerosis involves a litany of different drugs and other treatment modalities or therapies.

30.    From May of 2014 to August of 2016 the Plaintiff was taking anti-inflammatories (ibuprofen), steroids (methylprednisolone), muscle relaxers (Flexeril).

31.    The anti-inflammatories were taken by the plaintiff to deal with the daily pain she experienced due to Multiple Sclerosis.

32.    The methylprednisolone was taken by the plaintiff to aid her in staying awake and being alert.

33.    The muscle relaxers were taken to alleviate pain, muscle spasms, and restlessness associated with working long hours with Multiple Sclerosis.

34.    Taking the muscle relaxers resulted in periods as long as 24 hours in which the Plaintiff was unable to stay awake, alert, or perform her job.

35.    Multiple Sclerosis causes the Plaintiff to be substantially limited in her ability to perform sleeping, walking, standing, and bending.

**Ms. Adkins employment with the Defendant**

36.    Prior to her diagnosis of Multiple Sclerosis, Ms. Adkins was employed with Walmart Store #1351 at 1330 N. Eisenhower Drive, Beckley, WV 25801 as a Pharmacist.  Her employment began with the Defendant July 30, 2008 in another location for the Defendant, but the Plaintiff was assigned to Walmart Store #1351 on April 19, 2015.

37.    At times, and at the direction of the Defendant, Ms. Adkins would work at various stores as a Pharmacist in and around Southern West Virginia, up to and including Elkins, West Virginia on an as needed basis to fill in for other Pharmacists.

38.     Notwithstanding her temporary assignments to other stores on an as needed basis, the Plaintiff was based out of Walmart Store #1351.

39.     Ms. Adkins' duties as a Pharmacist included but were not limited to filling prescriptions as they were brought in by patient/customers, maintaining pharmacy records, managing pharmacy employees, ensuring accuracy of prescriptions, reporting to pharmacy management, maintaining her licensing as a pharmacist, continuing education, and other duties as directed by the Defendant.

40.     Ms. Adkins duties required her to stand for long periods of time given that shifts were some times as long as twelve (12) hours.  Ms. Adkins was a salaried pharmacist that was to work 48 hours per pay period (every two week pay period) in and around November 2015.

41.     Ms. Adkins performed her duties for the Defendant in a satisfactory manner for her entire employment history, never receiving a reprimand or disciplinary action per the Defendant's policies.

42.     Ms. Adkins received scheduled raises throughout her tenure with the Defendant, and always received high praise from her supervisors.

43.     The Plaintiff continued to work as a Pharmacist until March 20, 2017, when she was illegally terminated.

**Ms. Adkins worsening condition and application for a reasonable accommodation**

44.     In and around October through November of 2015, Ms. Adkins condition worsened to the level that she would need to take stronger medication to fight the worsening symptoms of her Multiple Sclerosis Diagnosis.

45.     Ms. Adkins' physician, Arun Venkatesan, MD, ordered her medication, Copaxone, to begin in and around November 2015.

46.    Common side effects of Copaxone injections include nausea, vomiting, increased need to urinate or have a bowel movement, body aches, joint aches, chills, fever, itching, double vision, headache, weakness, swelling in the hands and feet, vaginal discharge, flu like symptoms, sore throat, and more seriously dizziness, fainting, infection, mental changes/mood swings, shakiness, and vision problems.

47.    The benefits of Copaxone, which the Plaintiff and her physician desired, was to limit the Multiple Sclerosis' impact on the Plaintiff's daily mobility, thereby increasing her capacity to be effective at work, and also to slow the progression of the disease.

48.    While Copaxone can reduce the rate of progression of Multiple Sclerosis, it is not a cure.

49.    Due to the addition of Copaxone to Ms. Adkins' medication regimen, Ms. Adkins first contacted a salaried member of management by email, and then completed a "Request for Accommodation" form, said form prepared by the Defendant as a form document for requesting a reasonable accommodation for disability, indicating that she was "requesting to be placed on a schedule consisting of two twelve hour shifts per week with at least one day of rest in between shifts."

50.    Ms. Adkins informed the Defendant that the nature of the accommodation was permanent, and the request was due to her condition of multiple sclerosis.  Ms. Adkins informed the Defendant that she would be "starting medication treatment under the care of [her] neurologist in January," and she "will be starting a three time a week injection regimen that is recommended to be given on the same three days each week, forty-eight hours apart."

51.    Ms. Adkins informed the Defendant that she was still able to perform the essential functions of a staff pharmacist, and would like to continue enjoying the benefits of employment by working the schedule she requested, which was two twelve hour shifts per week.

52.    Ms. Adkins Request for Accommodation Form was dated November 19, 2015.

53.    The Defendant responded to the accommodation request through their "Accommodation Service Center" by denying the request for the stated reason that it would impact the company's ability to provide the necessary level of services to their customers and adversely affect the schedules of other associates.

54.    There was no other explanation given by the Defendant, and no reasoning provided by the Defendant as to how the level of service would be impacted or how other associates schedules would be impacted.

55.    Ms. Adkins request for an alternative work schedule was within the abilities of the Defendant to accommodate without impacting level of service to their customers or adversely affecting the schedules of other associates.

56.    The Defendant, within the same response, offered an alternative accommodation of working with her H/W market manager to explore other scheduling options, or to apply for intermittent/reduced hours if she were eligible, which would have changed Ms. Adkins' gainful employment status, causing her to lose insurance and retirement benefits.

57.    Ms. Adkins timely completed a "Request for Reconsideration" of the Defendant's determination on January 16, 2016, in which she asked the Defendant to review the medical information provided by her physician, Dr. Venkatesan.

58.    On January 27, 2016, the Defendant again denied Ms. Adkins' request for a Reasonable Accommodation, and again encouraged her to accept the alternative accommodation of working with her H/W market manager to develop a schedule that worked.

59.     Ms. Adkins work schedule, like many other Walmart Associates, was a set template. Inserted as a table in this paragraph is the template Ms. Adkins had been working since June of 2015:

| Saturday | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|---|---|
| 9am-7pm Store #1351 | 10am-6pm Store #1351 | Off | Off | Off | 8am-5pm Store #1351 | Off |
| Off | Off | 12pm-9pm Store #1351 | Potential Shift | Potential Shift | Potential Shift | Potential Shift |
| Off | Off | 12pm-9pm Store #1351 | Potential Shift | Potential Shift | Potential Shift | Potential Shift |
| 9am-7pm Store #1351 | 10am-6pm Store #1351 | Off | Off | Off | 8am-5pm Store #1351 | Off |
| Off | Off | 12pm-9pm Store #1351 | Potential Shift | Potential Shift | Potential Shift | Potential Shift |
| Off | Off | 12pm-9pm Store #1351 | Potential Shift | Potential Shift | Potential Shift | Potential Shift |

60.     In the table represented in paragraph 59 of this complaint, the Scheduled shift times were the allotted shifts of Ms. Adkins that did not change.  The "off" days were scheduled time off and would not have shifts assigned to them by management team members of the Defendant. The "potential shift" annotation represented a day in which the H/W Market Manager or the Pharmacy Manager could schedule Ms. Adkins for any shift deemed necessary.  These "potential shift" days were days in which Ms. Adkins could be put down for an eight, ten, or twelve hour shift at Store #1351, or any store within the District.

61.     Ms. Adkins' template, as a baseline, included a set thirty-six (36) hours of work in Store #1351, in which Ms. Adkins would only need to pick up an additional twelve (12) hours per two week period to achieve the agreed upon forty-eight (48) hours for full time consideration.

62.     The Defendant would regularly have Ms. Adkins, prior to the request for accommodation, work several shifts on "potential shift" days, and during some periods would result in Ms. Adkins working many hours more than the necessary forty-eight (48) hours per pay period.  On one such occasion in November 2015, Ms. Adkins worked fifty-three hours in a one (1) week period due to being scheduled multiple "potential shift" days.

63.     It was at this time that Ms. Adkins, now over-exhausted due to her condition and management's over-scheduling, made the request for a reasonable accommodation on the days that potential shifts could be assigned.

64.     Initially, Ms. Adkins requested verbally to Ms. Andrea Ruppenthal (the Health Wellness Market Manager) that she be allowed to work the Monday shift (opposite of the weekend shift weeks) as a twelve (12) hour shift in an effort to decrease the number of days in a week Ms. Adkins was working.

65.     If Ms. Adkins were to  be allowed to work two twelve (12) hour shifts on the templated Monday shifts during the weeks that Ms. Adkins were not scheduled on weekends, it would decrease the total number of days worked and she would be afforded the needed rest days to recover and administer her much needed Copaxone therapy.

66.     Ms. Ruppenthal response was to place the burden on Ms. Adkins to speak to the pharmacy manager, Ms. Cyndee Wills, (manager of the Pharmacy at Store #1351) to work out a schedule to accommodate Ms. Adkins.

67.     Ms. Ruppenthal instructed Ms. Adkins to communicate the days she needed off through email.  Ms. Adkins responded with her scheduled physician appointments in January 2016, which were during the week of January 19, 2016.  Ms. Adkins was templated to have that Tuesday off after she had worked a weekend, so Ms. Adkins purposefully scheduled her Doctor's appointments on her templated days off, including that Tuesday.

68.     As indicated in the table in Paragraph 59 of this complaint, that Tuesday would have been an "off" day in which Ms. Adkins was not scheduled to work.

69.     Ms. Ruppenthal attempted to schedule Ms. Adkins to work other shifts on the days of Monday, Tuesday, and Wednesday (January 16, 17, and 18, 2016).  Ms. Adkins was not scheduled to work on these days at all, and they were not marked as "potential shifts" on Ms. Adkins' template.

70.     Ms. Ruppenthal stated to Ms. Adkins that Ms. Adkins should have marked those days as "unavailable" in the Walmart scheduling system, even though those days were templated as "off" days in Ms. Adkins' template.

71.     This practice by Ms. Ruppenthal was a concerted effort on the part of the Defendant to develop a record of Ms. Adkins refusing shifts, as, at this time, Ms. Ruppenthal was aware of Ms. Adkins' diagnosis of Multiple Sclerosis.

72.     Ms. Adkins worked with her pharmacy manager, Cyndee Wills, to make changes to the Walmart SG3 scheduling system to approve the requested twelve (12) hour shifts on the aforementioned Mondays.  Ms. Wills made the necessary changes in the template system but due to the template itself being changed, the change required upper management approval by Ms. Ruppenthal.

73.     Ms. Ruppenthal had instructed Ms. Adkins to work with Ms. Wills to create an appropriate schedule, and Ms. Adkins followed those instructions, as well as the instructions given in the Denial of Accommodation letter by the Defendant, but Ms. Ruppenthal still refused to work with Ms. Adkins and approve the change to a twelve (12) hour shift on the particular Mondays requested.

74.     Ms. Adkins' required surgery on June 21, 2016, and Ms. Adkins requested a leave of absence beginning June 21, 2016 through August 2, 2016 to allow time for the surgery and the necessary post-operative recovery.

75.     It was during the post-operative recovery period, in July 2016, that Ms. Adkins requested to be changed to a part-time or hourly position.

76.     Due to the request, Ms. Adkins was transferred to a part-time position on August 6, 2016.

77.     In an effort to help with the transition, Ms. Adkins continued to work the previously templated weekend of August 20, 2016 and August 21, 2016.

78.     Based upon the instructions given by the Defendant in regards to the change of status, Ms. Adkins was to submit dates of availability by the first of the month, keep up to date with GLMS training modules, and work at least 104 hours per year.

79.     After returning from leave, on August 11, 2016 Ms. Adkins submitted her available dates for work up to and including November of 2016.

80.     It was after returning in the part-time status that Ms. Ruppenthal began harassing Ms. Adkins in regards to her available work dates.

81.     On September 22, 2016, Ms. Ruppenthal belittled and harassed Ms. Adkins in regards to the amount of time was working and accused Ms. Adkins of not submitting enough work days. Ms. Adkins had submitted her available work dates to the scheduler, Ms. Amy Stalnaker, through January 18, 2017.

82.     The agreement between the Defendant and Ms. Adkins was that Ms. Adkins would work a minimum of 104 hours in a fiscal year.

83.     The Walmart Fiscal year began on February 1, 2016 and ended January 31, 2017.

84.     Ms. Adkins had worked far in excess of 104 hours during that time period and could have conceivably continued to work far in excess of those hours per year for an extended period of time.

85.     In an email from September 26, 2016, Ms. Ruppenthal began threatening Ms. Adkins that if she did not work the 104 hours in a fiscal year she would be terminated from employment. Ms. Ruppenthal also demanded that Ms. Adkins work regularly, while also not defining what was expected of Ms. Adkins.

86.    In another email, on September 22, 2016, Ms. Ruppenthal threatened Ms. Adkins for being behind on compliance Modules and gave a deadline of October 1, 2016 to have the modules completed.

87.    Ms. Ruppenthal gave no consideration to the short-term disability leave that Ms. Adkins had just a month prior came back from and her change to part time status due to her medical condition.

88.    Ms. Adkins completed the compliance modules by the deadline given by Ms. Ruppenthal.

89.    After the continual harassment by Ms. Ruppenthal and lack of cooperation in Ms. Ruppenthal complying with the alternative accommodation resolution provided by Walmart's Accommodation Center, Ms. Adkins filed a complaint with the EEOC for failure to provide a reasonable accommodation to Ms. Adkins' disability and harassment.  Said complaint was filed on October 31, 2016 and was numbered 533-2017-00098.

**The Defendant's Continued Harassment of Ms. Adkins Subsequent to the Filing of the First EEOC Charge**

90.    Ms. Adkins provided days of availability up through March and April of 2017 by January of 2017 to Ms. Ruppenthal and Ms. Amy Stalnaker.  Ms. Stalnaker was the scheduler for the District's pharmacists.

91.    Ms. Adkins was never called to work on the litany of days for which she produced availability, and Ms. Ruppenthal continued to call Ms. Adkins in to work on days that she had marked unavailable.

92.    Ms. Ruppenthal continued, even after knowledge of the First EEOC Charge, to ignore Ms. Adkins' requests for work, and to cover for other employees that requested time off from work for various reasons.  Ms. Ruppenthal refused to allow Ms. Adkins to fill in for employees

that had requested time off of work, and had also requested Ms. Adkins to specifically fill their shifts.

93.     On March 20, 2017, Ms. Ruppenthal terminated Ms. Adkins employment while the first EEOC complaint was pending, citing that Ms. Adkins would not be able to fulfill the requirement of working 104 hours in the fiscal year.

94.     The fiscal year had only begun one month prior in February, 2017.

95.     Ms. Ruppenthal was aware of multiple shifts that needed filled for other pharmacists but refused to allow Ms. Adkins to work those shifts.

96.     Ms. Ruppenthal terminated Ms. Adkins because she filed an EEOC complaint, and because she continued to seek an accommodation for her disability.

### COUNT 1
### Americans with Disabilities Act
### 42 U.S.C. §12101, et seq.

97.     Plaintiff incorporates by reference paragraphs 1 through 96 as if fully set forth herein.

98.     Ms. Adkins is within the ADA's protected class because she was perceived by the Defendant and its managers, supervisors, and employees as having a disability, as they were aware of her diagnosis, medical records, and limitations associated with her condition.

99.     Ms. Adkins is within the ADA's protected class because she is a person with a disability that works in the critical area of health services.

100.    From in or about August 2015 until Ms. Adkins' termination, the Defendant and its managers and supervisors instituted and pursued a campaign of harassment and discrimination against Ms. Adkins on the basis of her disability, and adopted adversarial attitudes and hostile demeanors.  This harassment was frequent, severe and pervasive, and continued unabated until Ms. Adkins' discharge by the Defendant.  This conduct began as a result of Ms. Adkins request

for a reasonable accommodation to her severe physical limitations due to her condition of having Multiple Sclerosis.  Her managers, specifically Ms. Ruppenthal, displayed a disdain for Ms. Adkins and her continual protected requests to be treated fairly and in accordance with the law.

101.    Ms. Adkins was subjected to such harassment and discrimination in her workplace by the Defendant and its managers and supervisors because of her disability.

102.    The harassing and discriminatory acts involved the same type of employment actions, occurred frequently, were perpetuated and/or directed by the same manager and supervisor, were egregious, numerous and concentrated, and formed a series of overt acts that were designed to make Ms. Adkins continued employment with Walmart untenable, unsustainable, and constituted a hostile work environment as has been detailed throughout this complaint.

103.    The harassing and discriminatory acts were unwelcome by Ms. Adkins.

104.    Ms. Adkins workplace environment during her employment by the Defendant was permeated with discriminatory harassment, intimidation, ridicule, false reports of refusal to work or accept shifts, failure on the part of management to follow their own proposed alternative accommodation, and were all severe and pervasive enough to alter the conditions of Ms. Adkins' employment and create a hostile and abusive working environment based upon Ms. Adkins' disability.

105.    The Defendant did not undertake prompt and effective efforts sufficient to stop the hostile work environment detailed throughout this complaint.

106.    This hostile work environment unreasonably interfered with Ms. Adkins' ability to perform her job duties, by disrupting her relationship to the Defendant and its management, by the unreasonable criticism and scrutiny of Ms. Adkins' protected complaints and requests, which flowed directly from the Defendant's failure to take prompt and effective action to stop the

hostile work environment, by Ms. Adkins' need to spend many hours on otherwise unnecessary requests for accommodation, scheduling changes, and communications with management and other means of seeking relief and fair treatment from her employer, all while living under the stress of her disability.

107.   The effects of the hostile work environment alleged herein were felt by Ms. Adkins daily. Ms. Adkins was regularly made to feel humiliation and despair as a result of her reasonable fear that her supervisor would fail to follow the alternative accommodation and force her to exceed the limits of her disability and medication regimen.

108.   The hostile work environment was severe and pervasive, as alleged throughout this complaint.

109.   Multiple events contributing to this hostile work environment occurred within the 180-day period prior to Ms. Adkins' first EEOC charge.

110.   Ms. Adkins perceived the working environment to be abusive and hostile.

111.   A reasonable person in Ms. Adkins' circumstances would consider the working environment to be abusive or hostile.

112.   The Defendant was on notice of the hostile work environment, including actual notice by means of numerous requests, emails, and correspondence made by Ms. Adkins to management team members, including Ms. Ruppenthal, and the Corporate Office, as detailed herein, as well as vicariously and constructively by means of the acts perpetrated by Ms. Adkins direct supervisor, as detailed throughout this complaint.

113.   As a direct and proximate result of the Defendant's illegal hostile work environment, Ms. Adkins incurred damages including but not limited to lost income and benefits, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, pecuniary and

non-pecuniary losses, which damages would not have occurred but for the Defendant's illegal hostile work environment.

## COUNT 2
### Americans with Disabilities Act
### 42 U.S.C. §12101, et seq.
### Discriminatory Discharge

114.    The Plaintiff incorporates by reference paragraphs 1 through 96 as if fully set forth herein.

115.    Ms. Adkins is within the ADA's protected class because she was perceived by the Defendant and its managers, supervisors, and employees as having a disability, as they were aware of her diagnosis, medical records, and limitations associated with her condition.

116.    Ms. Adkins is within the ADA's protected class because she is a person with a disability that works in the critical area of health services.

117.    Ms. Adkins was qualified to perform the essential functions of her job without sacrificing the quality of her work product, endangering her customers/patients, negatively impacting the work product of other workers, unnecessarily causing changes to the work environment for the employer or other employees.

118.    Ms. Adkins one request to the Defendant is that she be allowed to work a 12 hour shift and have a subsequent day off, which the Defendant could have accomplished by Ms. Ruppenthal approving the changes made by Ms. Wills to the template.

119.    Ms. Adkins was discharged by the Defendant, as described throughout this complaint.

120.    Ms. Adkins did not engage in any infraction or offense that resulted in written disciplinary action or coachings, she was not complained on by any co-workers or customers, and she was not given negative performance reviews.

121.    Ms. Adkins was fully capable, and willing to work the minimum 104 hours per year, contrary to what the Defendant alleged at the time she was terminated.

122.    Nonetheless, even if Ms. Adkins could not work 104 hours out of the 3,804[1] hours left in the year at the time of her termination, such inability or lack of hours worked was exhibited by similarly situated part-time employees outside of the protected category to which Ms. Adkins belonged, and which management tolerated and condoned out of such employees other than Ms. Adkins.

123.    The Defendant had no rationale whatsoever to support the proposition that Ms. Adkins would be unable to work 104 hours out of the remainder of the fiscal year, other than the Defendant, by and through its supervisor Ms. Ruppenthal, refused to accommodate Ms. Adkins and refused to allow her to work on days when she could have worked, in an effort to keep her from meeting the number of hours necessary to maintain part time employment.

124.    Ms. Adkins' termination as a result of her perceived inability to meet the minimum number of hours worked was more severe than the discipline imposed on similarly situated employees who were outside of her protected category that were also in a part time position with similar hourly requirements.

125.    Ms. Adkins was unlawfully terminated by the Defendant because she was perceived as disabled, in that she was regarded by the Defendant and its supervisors and managers to have Multiple Sclerosis as the same were aware of her medical diagnosis, medical documentation, and treatment regimen.

---

[1] The fiscal year for Walmart began on February 1, 2017.  Ms. Adkins was terminated on March 20, 2017. Assuming the pharmacy is open 12 hours per day on average for the remainder of the year, that would leave 3,804 hours in which Ms. Adkins could have fulfilled the 104 hour requirement.  It is of note that 104 hours is approximately 2.7% of what was left of the working fiscal year.

126.    As a direct and proximate result of the Defendant's unlawful termination of Ms. Adkins by reason of her disability, she incurred damages including but not limited to lost income and benefits, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for the Defendant's unlawful termination of her.

**COUNT 3**
**Americans with Disabilities Act**
**42 U.S.C. §12101, et seq.**
**Retaliatory Hostile Work Environment**

127.    The Plaintiff incorporates by reference paragraphs 1-96 as if fully set forth herein.

128.    The Defendant's acts complained of through this complaint effectively deprived Ms. Adkins of equal employment opportunities as an employee because of retaliation for Ms. Adkins' request for accommodation, and subsequent filing of an EEOC charge alleging a failure on the part of the Defendant to provide a reasonable accommodation to Ms. Adkins and harassment.

129.    Ms. Adkins engaged in activities protected by the ADA by complaining to the Defendant, including to the Defendant's supervisors and managers, making requests on the Defendant's own forms, about the need for accommodation based on her disability, the discriminatory practices she endured due to her disability, and the hostile work environment based on her disability, as described herein, by opposing said practices and the hostile work environment directed at her.

130.    Ms. Adkins' exercise of protected rights was known to the Defendant because the requests and complaints were made to the Defendant, and to those engaging in retaliatory harassing acts, because they were made aware of her complaints, including but not limited to the First EEOC charge Ms. Adkins made, prior to the retaliatory harassing acts.

131.    Following and because of Ms. Adkins' exercise of her protected rights, the Defendant's managers and supervisors instituted and pursued a campaign of retaliatory harassment and discrimination against Ms. Adkins, and adopted adversarial attitudes and hostile demeanors. This harassment was frequent, severe and pervasive, and continued unabated until Ms. Adkins' retaliatory discharge by the Defendant.

132.    Ms. Adkins was targeted for harassment and subjected to a hostile work environment by managers and supervisors in retaliation for her exercise of her protected rights.

133.    The harassing acts involved the same type of employment actions, occurred frequently, were perpetuated and/or directed by the same managers and supervisors, were numerous and concentrated, and formed part of the same hostile work environment, as detailed throughout this complaint.

134.    Following and because of Ms. Adkins' ADA protected conduct, Ms. Adkins was threatened with and subjected to a hostile environment by the Defendant, including:

a.    The Defendant's baseless claim that she failed to complete compliance modules (CBL's) in a timely manner when she was on a short-term disability leave.

b.    The Defendant's threats to terminate Ms. Adkins if she did not meet the 104 hours per year of required work, when Ms. Adkins had worked far in excess of the 104 hours per year in the prior fiscal year.

c.    The Defendant's baseless claim that Ms. Adkins had refused a multitude of shifts.

d.    The Defendant's baseless claim that Ms. Adkins would be unable to work the 104 hours necessary to fulfill her obligations in the 2017 fiscal year.

135.    The harassing acts may have dissuaded a reasonable employee from making or supporting a complaint of harassment or discrimination.

136.    The acts aforementioned permeated Ms. Adkins' work environment, and were sufficiently severe or pervasive to alter the conditions of Ms. Adkins' employment to create a hostile and abusive working environment, as detailed throughout this complaint.

137.    The hostile environment unreasonably interfered with Ms. Adkins' ability to perform her job duties by disrupting her relationship to the Defendant and its management, which flowed directly from the Defendant's failure to take prompt and effective action to stop the hostile work environment, by Ms. Adkins need to spend many hours on otherwise unnecessary requests for accommodation and EEOC complaints, as well as other means of seeking relief.

138.    The effects of the hostile work environment alleged herein were felt by Ms. Adkins daily. For instance, Ms. Adkins felt humiliation and despair as a result of her reasonable fear of continued harassment and ill-treatment at any moment.

139.    The hostile work environment was severe and pervasive.

140.    Multiple events contributing to this hostile work environment occurred within the 180-day period prior to Ms. Adkins' first relevant EEOC charge.

141.    Ms. Adkins perceived the working environment to be abusive and hostile.

142.    A reasonable person in Ms. Adkins' circumstances would consider the working environment to be abusive or hostile.

143.    The Defendant's actions occurred because of retaliation for Ms. Adkins' exercise of her protected rights.

144.    The Defendant was on notice of the hostile work environment, including actual notice by means of complaints, requests, and other communications made by Ms. Adkins to the Defendant as detailed herein, as well as vicariously and constructively by means of the acts perpetrated by Ms. Adkins' supervisors, as detailed herein.

145.    The Defendant did not undertake prompt and effective actions sufficient to stop the hostile work environment detailed herein, or to prevent future discrimination and harassment.

146.    The retaliatory actions taken against Ms. Adkins may have dissuaded a reasonable employee from making or supporting a complaint of harassment or discrimination.

147.    Ms. Adkins was fully capable of working the 104 hours per fiscal year necessary to maintain her employment with the Defendant, however, even if she were not, similarly situated employees outside of the protected category to which she belonged were not terminated for not fulfilling this requirement.

148.    Ms. Adkins suffered termination as a result of the Defendant perceiving her to not be able to meet the 104 hour per fiscal year requirement, while similarly situated employees who did not meet the requirement but were not part of the protected category to which she belonged were not terminated for not fulfilling this requirement.

149.    As a direct and proximate result of the Defendant's illegal retaliatory hostile work environment imposed on Ms. Adkins, Ms. Adkins has incurred damages including but not limited to lost income and benefits, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for the Defendant's illegal retaliatory hostile work environment.

**COUNT 4**
**West Virginia Human Rights Act**
**Wrongful Discharge**

150.    The Plaintiff incorporates by reference paragraphs 1 through 96 as if fully set forth herein.

151. Ms. Adkins was an employee of the Defendant from July 30, 2009 through March 20, 2017.

152. Ms. Adkins was wrongfully terminated due to her disability on March 20, 2017.

153. Ms. Adkins wrongful discharge occurred in violation of the public policies announced in W. Va. State Code §5-11-2.

154. W. Va. Code §5-11-2 states, in relevant part:

> It is the public policy of the State of West Virginia to provide all of its citizens equal opportunity for employment…Equal opportunity in the areas of employment and public accommodations is hereby declared to be a human right or civil right of all persons without regard to race, religion, color, national origin, ancestry, sex, age, blindness or disability…

155. The right to be free from disability discrimination in the workplace is the public policy of the State of West Virginia.

156. These public policies were applicable to Ms. Adkins' wrongful termination.

157. Ms. Adkins, who was a member of a protected category by reason of her disability as alleged throughout this complaint was protected by these policies against disability discrimination in the workplace.

158. The Defendant's motivation in terminating Ms. Adkins violated West Virginia law against disability discrimination in the workplace.

159. By reason of her wrongful termination, Ms. Adkins has incurred damages including but not limited to lost income and benefits, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses.

## MANDATORY RECOVERY OF ATTORNEY'S FEES AND COSTS

160.    The Plaintiff incorporates by reference all previous paragraphs as if fully set forth herein.

161.    The Plaintiff has a mandatory entitlement to recover attorney fees and costs pursuant to provisions of the Americans with Disabilities Act.

## JURY DEMAND

162.    The Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Chanda Adkins, respectfully requests that this Court:

A.    Declare the acts, practices, and omissions complained of herein are illegal and violate Federal Law, specifically the Americans with Disabilities Act, as well as the Human Rights Act of West Virginia.

B.    Permanently enjoin the Defendant, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in the illegal conduct of discriminating against employees for reasons of their disability.

C.    Order the Defendant to institute and carry out policies, practices, programs, and training which provide equal employment opportunities for employees who are disabled, and which eradicate the effects of the Defendant's past and present illegal employment practices.

D.    Order other affirmative relief necessary to eradicate the effects of the Defendant's illegal employment practices.

E.    Direct the Defendant to pay Ms. Adkins her past and future pecuniary losses resulting from the illegal conduct and practices complained of herein, including back pay and front pay.

F.    Direct the Defendant to pay Ms. Adkins for her past and future non-pecuniary losses resulting from the illegal conduct and practices complained of herein, including humiliation, loss

of enjoyment of life, emotional distress, damage to her professional reputation, and other compensatory damages, in an amount to be determined at trial.

G.      Direct the Defendant to pay Ms. Adkins punitive and exemplary damages for its malicious or reckless conduct complained of herein, in an amount to be determined at trial.

H.      Award Ms. Adkins attorney's fees, costs, and disbursements as provided by law.

I.      Award such additional relief this Honorable Court may deem just and proper.

**CHANDA ADKINS**
**BY COUNSEL**

/s/ Brandon S. Steele
Brandon S. Steele, Esq.
WVSB #12423
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Ste 100
Beckley, WV 25801
304-253-1230
304-255-1520
bsteelelawoffice@gmail.com

and

/s/ Anthony M. Salvatore, Esq.
Anthony M. Salvatore, Esq. WVSB #7915
Hewitt & Salvatore, PLLC
204 N. Court Street
Fayetteville, WV  25840
304-574-0272
304-574-0273
asalvatore@hewittsalvatore.com